[No. G018552. Fourth Dist., Div. Three. Jan. 29, 1999.]

In re the Marriage of IDA and BENSON SCHAFFER.
IDA SCHAFFER, Appellant, v.
BENSON SCHAFFER, Respondent.

**COUNSEL**

Kevin G. Musulas for Appellant.

Brian G. Saylin for Respondent.

## OPINION

**SILLS, P. J.**—After a 24-year marriage,[1] the trial judge awarded Ida Schaffer spousal support of $850 per month for the first year and $650 per month for the second year, at which time there was to be a "jurisdictional step down" for the balance of Ida's[2] life. At the time Ida was 48 years old, had a master's degree in marriage, family and child counseling from Chapman University, and planned to get her Ph.D. in another 2 years. The trial judge, however, was clearly troubled by her choice of occupations. He doubted that she had "the emotional stability and self-control" to do the social and counseling work for which she was training, and suggested she was headed in the "wrong direction."

That was in 1980. For the next 15 years Ida never sought work outside of social work, and managed to extend her 2 years of support to 15 by a series of 6 postjudgment hearings for modification. In none of those six did she ever receive an order providing for support for a period of more than three years: Each of the different judges she came before obviously hoped she would eventually become self-supporting, albeit each also realized that, given the length of the marriage, the court should always retain jurisdiction to award support if circumstances required it.

Finally, in 1995—after Ida had quit one job working for a nonprofit organization in 1993 because of "stress" and was dismissed from another social work job in 1994 for inappropriately pursuing a grievance against a coworker—the latest trial judge to hear one of Ida's extension requests decided enough was enough. He refused to order more spousal support, though he did not terminate jurisdiction to order more support in the future.

■ The standard rule that modifications in support orders may only be granted if there has been a material change of circumstances since the last order (e.g., *In re Marriage of Biderman* (1992) 5 Cal.App.4th 409, 412 [6 Cal.Rptr.2d 791]) was designed to *prevent* repeated attempts to modify

---

[1]A previous opinion in this case, *In re Marriage of Schaffer* (1984) 158 Cal.App.3d 930, 933 [205 Cal.Rptr. 88] described the marriage as a "28-year marriage," by going from the date of marriage in 1952 to the date of the formal dissolution in 1980. The parties separated in 1976, so it is substantively more accurate to describe the marriage as lasting 24 years, not 28 years.

[2]We follow and commend Justice King's observation in *In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 475-476, fn. 1 [274 Cal.Rptr. 911], that courts should refer to parties in family litigation by their first names in order to both assist the reader and humanize a decision which seriously affects the litigants' lives. Obviously, no disrespect is intended by use of first names, and referring to parties by abstract litigation terms like "appellant" and "respondent" is generally an archaic practice which makes an opinion unnecessarily difficult to read. (Cf. *ibid.*)

support orders without justification, not to circumvent the goal that supported spouses become self-supporting within a reasonable period of time. (See Fam. Code, § 4320, subd. (k).) Yet that is precisely what has happened over the course of some 15 years in this case. Ida was able to extend her former husband Benson's obligation to pay spousal support for roughly six times as long as the original trial judge contemplated by not being able to find work in her chosen area whenever her last extension came due. True, at any given time it appeared she had a case for "modification" based on the asserted failure of an "expectation" that she would find a job in the applicable time period. (E.g., *In re Marriage of Beust* (1994) 23 Cal.App.4th 24, 29 [28 Cal.Rptr.2d 201].) Jobs in social work are hard to find and so it was possible to engage in a job search in the field with little danger of success. Each time she could credibly contend that the expectation of employment in the last order was "unrealized." (See *ibid.*)

But, like a large impressionist painting you have to stand a good distance away from to fully appreciate, the big picture showed a marked reluctance on Ida's part to become genuinely self-supporting by pursuing employment more suited to her temperament. The trial judge here was perceptive enough to realize what was going on and call a halt to the indefinite extensions. He realized that Ida had frittered away ("wasted" was his precise word) at least 10 years during which she might have trained for alternative employment. And on top of that she *quit* the one job she did obtain in her chosen field and managed to lose another. The record thus fully supports the trial judge's decision and comes nowhere close to an abuse of discretion.

### The Postjudgment History of the Case

Ida and Benson separated in 1976. Benson was a Los Angeles Superior Court commissioner; Ida was finishing up college on a full-time basis. By 1980 Ida had obtained her master's degree in marriage, family and child counseling from Chapman University. In July of that year, after the dissolution came to trial, Judge J.E.T. Rutter awarded Ida $850 per month spousal support for one year, then $650 for another year, with a "jurisdictional step down for the balance" of her life or until any remarriage. In doing so Judge Rutter admonished Ida to seek employment in an area more suited to her "temperament and emotional stability." He also lamented that he had to " 'play God' " by telling her that she was "headed in the wrong direction," but "no other course [was] available" other than the step down.

Ida didn't take Judge Rutter's advice; instead by February of 1982 she obtained a marriage, family and child counselor's license. Yet in July she filed an order to show cause (OSC) for a modification of the order seeking

an increase to $1,200 per month, arguing that severe chronic depression and anxiety made her *totally* unemployable. Judge Phillip Cox heard the matter. Ida was awarded $400 for another two years. On appeal, this court upheld the step down as against Ida's abuse of discretion challenge, because there was evidence that her "mental condition may not be permanent." (*In re Marriage of Schaffer, supra,* 158 Cal.App.3d at p. 935.) The two years gave Ida "sufficient time for her to recover and become fully self-supporting" and the fact remained that support was not " 'automatically' terminated in two years." (*Ibid.*)

*In re Marriage of Schaffer* was filed on August 1, 1984. Two days later Ida filed another order to show cause for modification of spousal support, claiming she had no income in the previous year because of a "deteriorating physical and emotional condition." The matter was eventually heard by Judge Robert A. Knox in April 1985. Judge Knox found that Ida was "physically able to work" but noted testimony that she was "unable to work under stress."[3] He awarded support of $750 a month for one year, $500 for the next year, commencing retroactively in February 1985. He also ordered Ida to "keep a record of her efforts to seek employment." In making his order, Judge Knox, like Judge Rutter before him, admonished Ida to be serious about becoming self-sufficient: ". . . You are not going to help yourself get work by sitting around watching daytime television. . . ." Judge Knox stated he wanted to see "a record of effort to get a job." He warned her: "[I]f you come back before this Court and you haven't demonstrated that you have made a real effort, I'm going to cut you off."

In January 1986, Ida once again filed an OSC for modification of spousal support, claiming she was unable to function under any type of stress, but had still "made a conscientious effort to find employment," albeit without success. (She attached five rejection letters to her moving papers.) Benson opposed the request, including in his papers an evaluation done by a firm of vocational consultants, who noted that a number of less stressful vocational alternatives to social work were open to her, including clerical or insurance-related positions, which existed in "sufficient numbers" in Orange County.

The 1986 matter did not come before Judge Knox, but before Judge Donald Smallwood. Based on a stipulation of the parties, he ordered the $750 spousal support to be paid until January 1987. He also ordered Ida to submit to an evaluation by a competent job counselor. During the period

---

[3]Judge Knox was fully aware of certain physical health problems which Ida had mentioned in her declaration. While those problems have certainly restricted the range of potential jobs for which Ida might look, they do not contradict Judge Knox's finding that she was still physically able to work.

1985 through 1987 Ida did some marriage, family and child counseling from her home.

In January 1987, Ida brought another order to show cause for modification of spousal support, based on not being able to meet her expenses on her "current support." That proceeding was heard by Judge Jack Mandel in March 1987. He ordered spousal support of $750 a month to continue for 36 months, with counsel for Ida to set a review at the end of the period or the $750 would terminate.

Ida filed her next order to show cause (OSC) for modification in March 1990, based on an asserted "inability to find and retain employment adequate to cover [her] living expenses." However, by this time she had a job: Since October 1988 (shortly after a suicide attempt) she had begun to see a new psychiatrist, who prescribed an antidepressant medication and arranged for her to do volunteer work. In January 1990, she had begun doing paid work for a nonprofit foundation, administered by the new psychiatrist, counseling manic-depressives and schizophrenics. She was a therapy group facilitator for one group meeting once a week, and a receptionist weekday mornings.

That OSC resulted in a stipulation, filed October 1990, extending spousal support for 15 months, until July 1991, with support to be reduced to zero at that time (albeit with a reservation of jurisdiction). The stipulation recited the fact of Ida's part time employment, and her hope that within the additional 15 months she would be employed full-time and "no longer require any contribution towards living expenses from" Benson. The stipulation further stated: "At the end of the 15-month period, if there is continued request for support, the burden shifts to [Ida] to prove the need for continuing support." The stipulation was signed as an order of the court by Judge Nancy Stock.

The next OSC for modification was filed in March 1991. Ida, now representing herself, requested an extension of support using the identical verbiage from her March 1990 papers. (It looks like she simply photocopied the relevant page from the last set of papers, whiting out the old date and inserting a new one.) This matter came before Judge John Woolley in August 1991. (By the time of the hearing, however, Ida had found a new attorney.) The court found Ida had "made a good faith effort to find employment considering her disabilities" and made a support order of $650 per month from August 1991 through January 1993, with reserved jurisdiction after that date.

When January 1993 rolled around, the parties submitted a stipulation providing for the $650 per month support to continue through January 1994,

with reserved jurisdiction thereafter. That stipulation was approved as a court order by Judge Daniel Didier.

In March 1993, Ida quit her job with the nonprofit foundation because (in her words) she was "burned out and stressed out." By July, however, she found a job as a marriage, family and child counselor at a group home. She lost that job in August 1994 because she repeatedly pursued an inappropriate complaint against another employee.

In November 1994, the parties stipulated to extend the $650 per month support order from October 1994 through December 1994. Judge Robert Hutson signed the order.

In January 1995 the parties stipulated to extend the $650 per month support payment through June 1995, in an order again signed by Judge Hutson.

The next month Ida filed a new OSC for modification, requesting an increase to $2,500 a month, based on her being fired from the group home in August 1994 and the fact her unemployment insurance was set to run out in February. She stated she was still looking for a position as a social worker, but was "fearful" that it would be "difficult" to find another position. Benson's opposition pointed out that he had retired from his commissioner's position in 1992, had done teaching and part-time judging since, and was planning to retire to the desert in 1996.

This time support was not extended. The new judge on the case, Commissioner Walter Posey, prepared his own statement of decision, holding that Ida's "ongoing poor judgment" in pursuing a career she had been warned not to pursue by the trial judge back in 1980 was demonstrated by the fact "this matter has extended nineteen (19) years since separation and fifteen (15) years since trial." He found that for many years Ida had failed to diligently pursue employment, that lack of good judgment was "complicated" by her voluntarily quitting her job because of " 'stress' " and that, even though she was now eligible for Social Security retirement benefits, she preferred to come back to court again to receive support from Benson. Thus, while awarding Ida's attorney $2,500 for his work, Commissioner Posey's order provided for no spousal support for Ida at the time. From that order Ida has now appealed.

*There Was No Abuse of Discretion in Reducing*
*Support to Zero Under the Circumstances*

As the present case illustrates perhaps better than any other, family law cases often do not end at the "final" judgment of dissolution. Because family

law cases typically entail issues concerning an ongoing relationship rather than a distinct event—child support, custody and visitation, for example— the law builds in the necessary flexibility to accommodate changing circumstances by postjudgment orders to show cause hearings where the judgment has provided jurisdiction to do so. Unlike an auto accident case which might end with a tidy final judgment for money damages, the successive modifications possible in a family law proceeding can make the case resemble an unruly desert caravan strung out upon the sands. But for the real human beings involved in family litigation (cf. *In re Marriage of Smith, supra,* 225 Cal.App.3d at p. 476, fn. 1 [". . . the parties in marital dissolution actions are human beings"]) that possibility can entail real costs as well as provide a necessary adjustment mechanism to accomplish justice.

In *Bidna* v. *Rosen* (1993) 19 Cal.App.4th 27 [23 Cal.Rptr.2d 251], this court confronted one aspect of a systemic problem inherent in the necessary adjustment mechanism of postjudgment hearings: The possibility that one party could oppress the other by the sheer number of such proceedings. In *Bidna,* that possibility was reified in a succession of six meritless OSC's and ex parte applications to change child custody. The oppressed party finally resorted to a civil suit for malicious prosecution against his ex-wife and his erstwhile mother-in-law who was financing the successive family court proceedings. Because no one judge ever got the big picture of what was going on, the oppressing party was able to bring those proceedings without being sanctioned for them in family court. As we noted in *Bidna,* "[I]n some large urban areas, there may be a 'time lag' built into the family law court's ability to respond to one party's attempts to wear the other down. It may not be apparent until several meritless proceedings have been brought that one party is conducting a campaign of attrition against the other . . . ." (*Id.* at p. 38.) And while the *Bidna* decision precluded a civil malicious prosecution remedy for the family court abuse in that case, we did recommend "single-judge assignments" as a "remedy *within* the family system." (*Id.* at pp. 38-39.)

The present case is, of course, not an exact repeat of the kind of unpoliced family court abuse that occurred in *Bidna*: There is nothing to suggest that Ida has tried to deliberately wear out or oppress her ex-husband by sheer repetition. But it nonetheless represents the kind of problem that can arise when no one judge is able to step back and see what is really going on with the parties.

The list of judges who have come into contact with the problem of Ida's unwillingness to wean herself off spousal support by finding work in an area where she had a decent chance of finding work is so long that it could almost

be an object of satire. Not counting Judges Stock, Didier and Hutson, who routinely approved stipulations, this case has passed from Rutter to Cox to Knox to Smallwood to Mandel to Woolley to Posey. And not one of these judges ever heard more than one of Ida's modification requests! Like the old television series, *The Prisoner*, this case has seen a new actor play the same role with each new episode, and for poor Benson there truly has been no escape.

We point this out not to suggest that rotating judges through family law assignments is some sort of reversible error, but to underscore the potential for injustice when, in a case involving a series of postjudgment hearings, one judge—as in the parable of the seven blind men describing an elephant—isn't able to see the case as a whole.

However, the last judge in this case, Commissioner Posey, didn't deliberately blinker himself to a myopic syllogism based on just a narrow cross-section of facts. He tried to gain an overview of the case. And what he saw is what any reader of our opinion will see from the description of the facts: Ida has never made a serious attempt to be self-supporting if it entailed going outside of social work. She has been content to let Benson assume the risk that she could not find a job in her preferred field, and let him pay for the fact her preferred field is one to which she is not temperamentally suited.

There is, then, no doubt that if Commissioner Posey was able to look at the *whole* of Ida's conduct over the 15-year time frame since the judgment, his decision was well within the discretion accorded a family law judge making a spousal support modification decision. (E.g., *In re Marriage of Olson* (1993) 14 Cal.App.4th 1, 7 [17 Cal.Rptr.2d 480] [standard of review in spousal support modification hearings is abuse of discretion in light of the facts and circumstances of each case].) There is no indication that Ida had attempted to gain any job skills outside of social work, or had seriously sought employment in any of the nonstressful occupations which the vocational counselors identified as suitable for her.

Rather, as we have just mentioned, her case must rely on a myopic syllogism. That syllogism goes like this: A court can only look at whether there has been a material change of circumstances since the last order. (E.g., *In re Marriage of Kuppinger* (1975) 48 Cal.App.3d 628, 633 [120 Cal.Rptr. 654].)[4] The ending of support provided for in the last order in this case was predicated on the idea that Ida might find employment within the interim. As long as a supported spouse makes a "reasonable" effort to find employment,

---

[4]There is no need to cite all the cases which simply repeat the formulation. It has been around since *Snyder* v. *Snyder* (1933) 219 Cal. 80 [25 P.2d 403].

his or her inability to find employment in such an interim period is an " 'unrealized' " expectation that justifies a modification of the order extending support further. (E.g., *In re Marriage of Beust, supra*, 23 Cal.App.4th at p. 29; see also *In re Marriage of Aninger* (1990) 220 Cal.App.3d 230, 240-241 [269 Cal.Rptr. 388].) Here, Ida made reasonable, though unsuccessful, efforts to find a job (in social work, of course) in the interim since the last order; that was the only relevant fact. The judge could not examine the entire case and see a pattern of avoidance of trying to become self-supporting; ergo, it was an abuse of discretion not to give her yet another extension of support.

As we said at the beginning, the purpose of the rule that family courts look to material changes of circumstances since the last order before modifying support is based on the need for finality. If the rule were otherwise, unhappy spouses could abuse the system by bringing "repeated actions for modification with no burden of showing a justification to change the order." (*In re Marriage of Biderman, supra*, 5 Cal.App.4th at pp. 412-413.) Yet the syllogism we have just outlined does precisely what the rule that forms one of its major premises was designed to prevent: It results in a spouse who is unhappy with the prospect of support ending being able to circumvent the clear contemplation of the previous order by never quite becoming truly employable in the relatively narrow time frame since the last order—a fact which becomes camouflouged when different judges hear each discrete modification proceeding and look only at what has happened since the last one.[5]

Employability and the efforts one makes to become self-supporting are not always just a matter of one or two years: Sometimes it takes longer periods for patterns to emerge. The Family Code, for example, provides as a guideline that a reasonable period of time for a spouse to become self-supporting is generally one-half the length of the marriage. (Fam. Code, § 4320, subd. (k).)[6] The statutory guideline flies in the face of a reading of the material change of circumstance rule that would prevent a trial judge from looking at long-term patterns of job training and employability.

Here, in the decade and a half since Judge Rutter's admonition, Ida's job search efforts were almost exclusively directed toward finding work in an area to which she is not suited. There is no indication that she was willing to

[5]We also note the demoralizing impact on the supporting spouse, whose hope is periodically lifted for one- and two-year intervals, only to have it dashed when he or she discovers that the accumulated unwillingness of the ex-spouse to find suitable work can never be considered by the court.

[6]Ida had already exceeded the 12-year guideline by the time the case got to Commissioner Posey.

take work in less stressful, even if arguably less exalted fields (such as being a hospital or doctor's office insurance clerk or a legal file clerk) where jobs were plentiful. Moreover, she even lost the two jobs she did find in social work, under circumstances over which she had control. They weren't lay-offs: She quit one job and got fired from the other. Her lack of employment when the last of her modification hearings came before Commissioner Posey only proved the prescience of Judge Rutter's admonition.

Family courts are courts of equity and there is a basic principle of equity that one cannot take advantage of one's own wrong. (Civ. Code, § 3517; e.g., *In re Marriage of Aninger, supra,* 220 Cal.App.3d at p. 242 ["By undertaking a debt beyond her reasonable means to pay presently or in the foreseeable future, Ms. Aninger failed to make a reasonable effort to become self-supporting."].) In this case, while it wasn't Ida's own "wrong," it was an unwise decision pursued against the express advice of Judge Rutter. (See *In re Marriage of Aninger, supra,* 220 Cal.App.3d at p. 242.) For Commissioner Posey to have extended support one more time would only have been an act of "enabling"—if not actually vindicating—Ida's reluctance to look for work in a more suitable field.

*In re Marriage of Beust, supra,* 23 Cal.App.4th 24 hardly compels a contrary result. There, a supported spouse sought a first modification after involuntarily losing her job just a few months before an automatic step provision in the judgment of dissolution was to reduce support to zero. The supporting spouse argued that a modification would circumvent the judgment's automatic step-down provision; the trial court apparently agreed, relying on the *Aninger* case. (See *id.* at p. 28.) The decision was reversed because the step-down provision was not intended to straitjacket a judge from subsequently modifying the support order if the circumstances required it—after all, public policy disfavored termination of even the jurisdiction to award further support on a future specified date. (See *id.* at p. 29.)[7] The net "result" of the trial court's order in *Beust* was to allow a huge disparity of

---

[7]Judges must always be aware of the tendency of the common law to be like the child's birthday game where a few words are whispered into the ear of one person who then repeats them to the next and so on until the words have made their way round the table and it is finally discovered that they have been mangled beyond all recognition. *Beust* was a case where the permanent support order contemplated a step down to a jurisdictional level so that the family court would have the "jurisdiction" to step up support again if necessary. (See *In re Marriage of Beust, supra,* 23 Cal.App.4th at p. 26.) For the proposition that "State policy disfavors termination of spousal support on a specific future date, *even* if it is based on the hope that this will induce the supported spouse to become financially independent" the court cited *In re Marriage of Vomacka* (1984) 36 Cal.3d 459, 467 [204 Cal.Rptr. 568, 683 P.2d 248], without discussing either the facts of *Vomacka* or quoting applicable language. But *Vomacka* never said what *Beust* said it said. It said something close. It said, in the context of explaining why an ambiguous order should not be interpreted to cut off all *jurisdiction* to

income in the case of a 32-year marriage where the supported spouse was unquestionably trying to find employment (she had found a new job even before bringing her modification request). (See *id.* at pp. 29–30.) The case hardly stands for the proposition that a family court in a modification proceeding must be blinkered from ever looking at overall patterns over the course of many years and many proceedings.[8]

*In re Marriage of Aninger, supra,* 220 Cal.App.3d 230, is much closer to the mark, because it unquestionably stands for the proposition that a supported spouse cannot make unwise decisions which have the effect of preventing him or her from becoming self-supporting and expect the supporting spouse to pick up the tab. (There, the supported spouse went out and bought an expensive condo she was unable to afford.) Here, Benson has been forced to pay for Ida's unwillingness to consider more suitable employment for a period of 15 years.

### Disposition

The common law rule that spousal support modifications require a material change of circumstances cannot be mechanistically applied in circumstances where one party's long-term conduct over a longer term than just the time since the last OSC may be relevant. Given that Ida's unwillingness to become self-supporting is best illustrated by looking at her conduct over a 15-year time frame, it is unfathomable that Commissioner Posey's decision to examine the whole of that conduct could be an abuse of discretion. The judgment is affirmed.

Bedsworth, J., concurred.

**SONENSHINE, J.,** Dissenting.—My colleagues conclude the trial judge correctly examined Ida's conduct over the 15 years since the dissolution

award support after a step-down date, "orders providing for *absolute* termination of spousal support on a specified date are disfavored . . . ." (*Vomacka, supra,* 36 Cal.3d at p. 467, italics added.) The difference between a step-down order which allows for retention of jurisdiction to award support in the future and one which doesn't is the difference between lightning bug and lightning: One represents a relatively modest accommodation to the need for an incentive to become supporting and the other is an absolute bar to any support regardless of future circumstances. The case before us falls into the less controversial "lightning bug" category.

[8]We have already noted that California law builds in the necessary flexibility to accommodate changing circumstances over time in the context of spousal support by allowing modification proceedings. Inherent in the process is that courts cannot be limited to arbitrarily short intervals if it means blinding them from facts and patterns which transcend those intervals. Our dissenting colleague, however, appears to favor a more rigid model. She declares "[o]nce decided, always decided." (Dis. opn., *post,* at p. 815.) With all due respect to our colleague, that idea bears more in common with the ancient law of the Medes and Persians than it does with the law of modern California. (Cf. Daniel 6:15 [decrees established by king could not be changed].)

judgment. They are wrong and, in any event, they mischaracterize the evidence. Moreover, they misconstrue the change of circumstances requirement as applied to a postjudgment proceeding such as we consider.

## THE RECORD

The majority, following the trial judge's lead, paint a picture of a 63-year-old woman who has spent the last 15 years *refusing* to become self-supporting despite constant judicial warnings. They point to her repeated visits to the courthouse, concluding "enough is enough."

A review of the record paints a different picture. Ida had already obtained her bachelor's and master's degrees in counseling at the time of the dissolution. As we noted in our previous published opinion, the 1980 judgment was premised on a finding "wife suffered from emotional maladies which precluded her from [then] working as a counselor . . . ." (*In re Marriage of Schaffer* (1984) 158 Cal.App.3d 930, 933 [205 Cal.Rptr. 88].) However, the judgment was also "based on its presumption that she could be self-supporting as a marriage, family and child counselor." (*Id.* at p. 935.)

Ida was still unable to totally support herself in 1982. The trial court in fact found this expectation unrealized. The judge noted, "[H]er mental condition may not be permanent[.] . . . [He] allowed . . . her [time] to recover and become self-supporting." (*In re Marriage of Schaffer, supra,* 158 Cal.App.3d at p. 935.)

Ida returned to court in 1985. The court continued the support order. Her declaration indicated she had been unable to earn any income during the last year due to her deteriorating physical and mental health. Specifically, she delineated brain tumor surgery, carpal tunnel syndrome, kidney stones, and ongoing counseling for severe emotional problems.

A year later, Ida and Benson filed orders to show cause. She asked for more support; he requested its termination. They stipulated to monthly support of $750, continuing until January 1987.

The parties returned to court six times thereafter in 1987, 1990, 1991, 1993, 1994 and 1995. The 1987 and 1991 hearings were contested. The other four orders were based on the parties' stipulations. All of Ida's declarations were the same. She was trying, but the underlying presumptions, made at the time the court ended their 24-year marriage, failed to come true.

At the 1991 hearing, the court found Ida made a "good faith effort to find employment considering her disabilities." The record bears this out. Ida was

self-employed as a counselor from 1985 to 1987. The part-time job she started in 1988 became a full-time position in 1991. She quit in 1993 due to stress, but shortly thereafter accepted another position. In 1994, she was fired after her supervisor decided she inappropriately pursued a personal complaint against another employee.

## This Hearing and the Court's Statement of Decision

Ida filed the underlying order to show cause seeking a continuation of the support order. This time, Benson refused to stipulate and instead the matter proceeded to hearing. The court denied Ida's request but maintained jurisdiction over the support.

The trial court issued a detailed statement of decision, starting with matters which took place during the marriage and ending with the present situation.[1] The court noted Benson's ability to pay support and Ida's need, but found it "unfair to require" him to do so because "for many years [Ida failed] to diligently pursue employment."

## Trial Court Standard

Ida concedes it was her burden to establish a basis upon which the court could order the support to continue. She argues she did, but the court erred in looking to their entire marital history as opposed to circumstances from the last order.[2] She is right.

"A judgment for spousal support is conclusive as to the circumstances existing when it was entered. All matters that were at issue in the [past] proceedings and that were disposed of by the [order] are res judicata. The [previous] order may be subject to direct attack . . . but it is not subject to collateral attack by application for modification. [¶] If determinations have

---

[1]The court referenced the parties' 24-year marriage, their 1976 separation and Benson's prejudgment voluntary support of Ida "in an amount that was in excess of the amount that would have been ordered by the court . . . ." The court noted during the marriage Ida worked as a receptionist and office assistant. It also commented she had attended college part-time before separation but became a full-time student thereafter. The judge explained Ida testified at the 1980 trial she had obtained bachelor's and master's degrees and hoped to pursue a Ph.D. in marriage, family, and child counseling. Despite the trial court's admonition that Ida lacked the necessary temperament and emotional stability, she continued her studies.

[2]It matters not that the last prior order resulted from the parties' stipulation. As we recently explained, the rule applies to litigated orders *and* those resulting from a stipulation. (*In re Marriage of McCann* (1996) 41 Cal.App.4th 978, 984 [48 Cal.Rptr.2d 864].) "The court, by including the stipulation in its own decree, presume[d] that the parties arrived at a fair support award, after arm's-length negotiations, that took [these factors] into consideration . . . ." (*In re Marriage of Hentz* (1976) 57 Cal.App.3d 899, 901-902 [129 Cal.Rptr. 678].)

been made on a motion to modify after the original order, the most recent order is conclusive as to the circumstances existing when it was made. On a new motion to modify, the determinations are to be made with respect to facts arising during the period commencing with the date of the most recent order and not with respect to the time since the original decree was entered." (2 Kirkland et al., Cal. Family Law: Practice and Procedure (2d ed. 1998) Modification of Spousal Support, § 52.21, p. 52-9, fns. omitted; *Hester v. Hester* (1969) 2 Cal.App.3d 1091, 1095 [82 Cal.Rptr. 811].) To allow otherwise would sanction " '. . . collateral attack[s] on a prior final order . . .' " (*In re Marriage of Biderman* (1992) 5 Cal.App.4th 409, 412-413 [6 Cal.Rptr.2d 791]; *In re Marriage of Aninger* (1990) 220 Cal.App.3d 230, 238 [269 Cal.Rptr. 388].)

This *certainly* is not a new concept. We said exactly this in our prior opinion: "The tasks of the court at a postjudgment modification hearing are to discern the change, if any, of the circumstances established at the [last hearing] and to formulate an order based upon those changes." (*In re Marriage of Schaffer, supra*, 158 Cal.App.3d at p. 934, fn. omitted.)

The danger of straying from this time-honored rule is obvious, as exemplified here. Benson lost his first appeal, arguing many of the same issues he repeats now. Other judges made findings directly contradicting this trial judge's conclusions.[3] Benson is getting more than another bite at the apple— the majority allows him to bake a whole new pie!

Once decided, always decided. "[F]actual issues considered and [previously] resolved . . . are fused and form the foundational mosaic upon which [a past] . . . judgment rests; they cannot be singly or jointly analyzed anew upon a subsequent modification hearing." (*In re Marriage of Schaffer, supra*, 158 Cal.App.3d at p. 934.)

### Correct Standard, Different Result

"Although a trial court has broad discretion in . . . modifying an award of spousal support, it is without authority to [do so] . . . unless there has been a material change of circumstances *subsequent to the last prior order*." (*In re Marriage of Kuppinger* (1975) 48 Cal.App.3d 628, 633 [120 Cal.Rptr. 654], italics added; see also *In re Marriage of Olson* (1993) 14 Cal.App.4th 1, 9 [17 Cal.Rptr.2d 480].) However, if assumptions contained in the previous order "fail to materialize on schedule, despite reasonable efforts on the part

---

[3]The trial court found, for example, "for at least ten (10) years, [Ida] made no effort to become financially independent by obtaining appropriate employment." This contradicts the 1991 finding of her "good faith effort[s] to find employment considering her disabilities."

of the supported spouse, the court may find a change of circumstances justifying modification of the support order." (*In re Marriage of Aninger, supra*, 220 Cal.App.3d at p. 240.)

Pursuant to the last order, Benson was to continue to pay monthly support of $650 until June 1995, and Ida was to inform Benson should she become employed prior to that time. Implicit are the following assumptions: (1) Ida was still unemployed; (2) she was to continue to use her best efforts to find work; (3) her unemployment insurance failed to satisfy her needs; (4) the support payments were intended to supplement Ida's income; and (5) because the unemployment insurance payments were to terminate in February 1995 and the court retained jurisdiction, the parties did not necessarily contemplate Benson's support obligation would end in June.

"[This] language is unambiguous and reserves for future court decision, *should the need arise*, [Ida's] entitlement to spousal support beyond [June 1995]." (*In re Marriage of Beust* (1994) 23 Cal.App.4th 24, 28-29 [28 Cal.Rptr.2d 201], italics added.) "To justify a continuation of support, [Ida] ha[d] the burden to show a change of circumstances since the agreement was executed in 19[95]. So long as [she] . . . ha[d] made reasonable efforts to become self-supporting," she fulfilled that burden. (*Id.* at p. 29.) The only question to be answered by the trial court therefore was: Had Ida used her best efforts to find employment?

The short answer is yes. Ida "presented evidence that she ha[d] made reasonable efforts to become self-supporting, but ha[d] failed to do so as 'expected.' The trial judge [however, rejected this] . . . evidence . . . . This [was wrong and] defies the factual record. [¶] . . . [T]he court's failure to give any weight to [Ida's] evidence of continuing need is more egregious in light of [the court's finding of Benson's] continuing ability to pay spousal support.[4] Thus, this situation is not one where the financial needs of *both* parties cannot be satisfied. [Citation.] As such, the court's denial of [Ida's] motion for modification is an abuse of discretion." (*In re Marriage of Beust, supra*, 23 Cal.App.4th at pp. 29-30, original italics.)

Ida's order to show cause asked for $2,500 a month. She explained her unemployment insurance of $989 was due to expire on February 11, 1995. Because she was 63 years old, she was entitled to monthly Social Security benefits of $340, but preferred to wait until she was 65 when she could

---

[4]As previously discussed, the court instead looked to the following: trial court findings from the original judgment; Ida's pre- and postseparation education; her efforts to find, and her actual, employment from the time of separation; the duration and level of postseparation but prejudgment support and the number of postjudgment modifications.

receive $440. Although she had been looking for work, her age, and her medical and mental condition kept her from finding anything. She declared she "looked through the ads in the newspapers, mailed numerous resumes and made numerous telephone calls, all to no avail." She attached 14 copies of letters she received in response to her attempts to find employment. She also submitted unemployment insurance forms from September 19, 1994, through February 10, 1995, evidencing she had contacted several hundred potential employers.

Even the trial court acknowledged: (1) Ida "has had and continues to have emotional problems"; (2) Ida had no income at the time of the hearing; (3) she was eligible to receive monthly Social Security benefits of $330; (4) Ida deferred receipt of those benefits, wishing to receive a larger amount at age 65; (5) Ida had approximately $19,000 in savings; (6) Benson's financial situation is superior to Ida's; and (7) he has the ability to pay spousal support.

"[T]he trial court's order constitutes an abuse of its discretion . . . ." (*In re Marriage of Beust, supra,* 23 Cal.App.4th at p. 31.) I would remand the matter to the superior court for a rehearing on the amount and duration of spousal support.